SUN OIL COMPANY OF
PENNSYLVANIA

v.

Louis L. GOLDSTEIN, Comptroller of Treasury of State of Maryland, Francis B. Burch, Attorney General of Maryland and Sandra A. O'Connor, State's Attorney of Baltimore County.

Civ. A. No. N–77–1960.

United States District Court,
D. Maryland.

June 23, 1978.

Thomas D. Washburne, Baltimore, Md., and Milton Eisenberg, Francis J. O'Toole and Theodore C. Hirt, Washington, D. C., and Frank R. Roark, Philadelphia, Pa., for plaintiff.

Thomas M. Wilson, III, Asst. Atty. Gen., and Chief, Antitrust Div., and Charles O. Monk, II, Asst. Atty. Gen., Francis Bill Burch, Atty. Gen., Baltimore, Md., for defendants.

NORTHROP, Chief Judge.

Sun Oil Company of Pennsylvania (Sun), filed this action for declaratory and injunctive relief against Maryland Comptroller Louis L. Goldstein and Maryland Attorney General Francis B. Burch on November 22, 1977. Sandra A. O'Connor, State's Attorney for Baltimore County, was added as a party defendant on February 24, 1978.

Plaintiff, a refiner of petroleum products, is a corporation organized under the laws of Pennsylvania with its principal place of business in that State. Plaintiff markets its products in Maryland and throughout the United States. Defendants are Maryland officials charged with the administration and enforcement of Md.Ann.Code Art. 56, § 157F(a) of the Maryland Motor Fuel Inspection Law, as amended by Chapter 870 of the Laws of Maryland, 1977. Sun, through its complaint, has challenged the constitutional and statutory validity of this section. This Court's jurisdiction is properly invoked under 28 U.S.C. §§ 1331, 1332, 1343 and 2201.

Plaintiff's motion for a preliminary injunction was denied by the Court, after oral argument, on December 29, 1977. Thereafter, the parties filed cross-motions for summary judgment, and on March 30, 1978, counsel presented oral argument in support of their respective positions. At the conclusion of this hearing, the Court granted plaintiff's motion on the questions of standing and ripeness and denied the motions of both parties in all other respects.

Subsequently, plaintiff scheduled the deposition of Maryland State Senator C. Lawrence Wiser and requested the production by him of certain documents asserted to be relevant to the case. In response and on behalf of Senator Wiser, counsel for defendants filed a motion for protective order, asserting the Senator's privilege under the "Speech or Debate Clause" of Article 10 of the Maryland Declaration of Rights and Article I, § 6, cl. 1 of the United States Constitution. After oral argument on April 11, 1978, the Court denied the protective order, but granted a stay of the deposition pending appeal.[1] The parties stipulated that the case should proceed without regard to the content of the proposed deposition of Senator Wiser, and the trial commenced on April 24, 1978.

## I.

The pertinent portion of section 157F(a), referred to as the Conversion Moratorium Law (hereinafter CML), being challenged in this case reads as follows:

Certificates of registration shall not be issued to retail service station dealers marketing motor vehicle fuel through retail outlets enlarged, altered, or structurally modified (other than as may be required by appropriate governmental authority) in any way after July 1, 1977, and before July 1, 1979, unless the facilities contain enclosed work areas where service of motor vehicles is offered to customers, irrespective of whether or not motor vehicle fuel is purchased, including, but not limited to lubrication, oil change,

tire repair, battery charge, and replacement of accessories such as fan belts, radiator hose and wiper blades. This restriction shall not apply to stations which do not have such enclosed work areas prior to the time that they are enlarged, altered or structurally modified. A service station which has been closed for 30 days or more prior to July 1, 1977, shall be considered as newly established, for the purposes of this section, at the time as it is reopened and offering motor vehicle fuel for sale to the general public. [Md.Ann.Code, Art. 56 § 157F(a) (Supp. 1977)].

Sun contends this law violates the Commerce, Due Process and Equal Protection Clauses of the United States Constitution.

Sun's Commerce Clause claim, in essence, asserts that the statutory burdens imposed on the marketing of gasoline in interstate commerce by a specified class of retail service station dealers are not justified by any local public benefits directly attributable to the law. Sun also asserts that the law is invalid by virtue of the availability of less burdensome or nondiscriminatory alternatives.

Plaintiff's claim under the Due Process Clause is two-fold: (1) that the challenged law requires maintenance of enclosed work areas on its various station properties as a form of public benefit, without assuring to Sun a fair return on its corporate investment in such facilities; and (2) that the law is based on an impermissible irrebuttable presumption that maintenance of the work areas at all retail service stations having those facilities on July 1, 1977, is required to assure an adequate supply of automotive repair, maintenance and emergency road services to motorists on Maryland highways. According to Sun, it necessarily follows that the law deprives owners of these specified facilities of the opportunity for a meaningful hearing to show that the statute impairs their property rights without conferring any public benefit.

---

1. The appeal, noted to the Fourth Circuit Court of Appeals on April 13, 1978, in Senator Wiser's behalf, was dismissed by that Court for mootness on May 9, 1978.

Sun's final attack under the Equal Protection Clause focuses on the argument that there is no rational basis for the separate classifications created in the law. The exempt facilities include (1) all gasoline stations that did not provide automotive services before July 1, 1977, (2) all gasoline stations constructed without enclosed automotive service facilities after July 1, 1977, and (3) all service stations whose enclosed service areas were not in operation for at least 30 days prior to July 1, 1977. Sun argues that it is illogical to exempt from the law's requirements certain facilities which are in direct competition with the stations mandated to offer repair services, particularly in light of the purported statutory purpose, i. e., to assure an adequate supply of emergency repair facilities and to promote highway safety.

Defendants refute all of plaintiff's Constitutional challenges. They maintain that the law in question is not violative of the provisions of the Commerce Clause, Due Process Clause or the Equal Protection Clause of the Constitution. Defendants argue that, on its face, the law neither discriminates against interstate commerce, nor places more than a *de minimus* burden on Sun in relation to its total operation in Maryland. Defendants seek to establish that there are substantial benefits inuring to motorists utilizing the State highways. In sum, they advocate that the law accomplishes its legislative objective in a logical and not unduly burdensome manner, and that any less restrictive legislation would not produce the important local public benefits generated by this statute.

Defendants attack Sun's Due Process claim, asserting that the amendments to section 03.03.07, Subtitle 03, Title 03 of the Code of Maryland Regulations (COMAR), promulgated by the Comptroller of the Treasury, are sufficient to provide Sun with notice and hearing procedures.[2] Defendants assert that Sun's irrebuttable presumption argument is inapplicable, in view of the factual situation in this case. They dispute Sun's characterization that the law imposes public utility-type obligations on Sun's ser-

2. In accordance with the provisions of the Administrative Procedure Act, Md.Ann.Code, Art. 41, § 244 *et seq.,* the Comptroller of the Treasury promulgated amendments to Regulation .10 *Registration,* of Section 03.03.07 *Motor Fuel Inspection Regulations,* Subtitle 03 *Gasoline Tax Division,* Title 03 Comptroller of the Treasury, of the Code of Maryland Regulations (under authority given in Md.Ann.Code, Art. 56, § 157B), duly published in the Maryland Register, Vol. 5, Issue 3, February 10, 1978, which became effective April 7, 1978. *See* COMAR Title 03, Supp. 1 at 112, May 19, 1978 and *Maryland Register,* Vol. 5, Issue 7, April 7, 1978.

The pertinent amendments, 03.03.07.10 §§ F and G read as follows:

F. Formal Hearing Procedure.

(1) Any person, partnership, corporation, or other entity denied a Certificate of Registration by the Comptroller may request a formal hearing within 30 days after receipt of written notice of:

(a) The denial; or

(b) The denial after review at an informal conference.

(2) The request for hearing shall be in writing and set forth the grounds upon which review of the denial is sought.

(3) After receipt of a written request for hearing the Comptroller shall give reasonable notice to the petitioning party of the date and time for hearing. All hearings shall be held at the Annapolis, Maryland office of the Comptroller and shall be conducted by the Comptroller or his designee in accordance with Article 41, § 252, Annotated Code of Maryland. The petitioning party is required to obtain the service of a stenographer, and the State will make reimbursement for one-half of the costs of the transcript of the hearing without regard to the final disposition of the case. The petitioning party, who may be represented by counsel at the hearing, shall be afforded the opportunity to make an opening statement and present witnesses in his behalf. Formal rules of evidence may not apply but the testimony of witnesses shall be responsive to the questions asked and relevant to the issues of the case.

(4) The Comptroller shall summons witnesses to appear at the hearing at the request of the petitioning party.

G. Decision and Appeal.

(1) The hearing officer shall render a written decision stating his findings of fact and conclusion of law. A copy of the decision shall be promptly mailed to the petitioning party.

(2) Appeal from the decision of the hearing officer shall be in accordance with Article 41, § 255, Annotated Code of Maryland.

vice stations. Finally, defendants state that the law is not vague and ambiguous, but is sufficiently defined so as to preclude speculation as to the meaning of its terms.

Defendants counter Sun's Equal Protection challenge by asserting that the law satisfies fourteenth amendment guarantees. They contend that the classifications created by the law are rationally related to the legitimate State interest of promoting motoring safety by insuring the continued availability of the type of automotive maintenance and emergency repair facility relied upon by a large segment of Maryland motorists. This contention is based on defendants' argument that the preservation of full service stations is a legitimate State interest, and that the law in question is within the realm of legislative power constitutionally granted to State legislatures.

## II.

The Conversion Moratorium Law became effective on July 1, 1977 as to service station conversions, and as adopted, is a two-year moratorium terminating on July 1, 1979. The prohibitions contained in the law are enforceable through the Comptroller's control of the issuance of certificates of registration for retail service stations. Should a dealer convert a retail service station in violation of § 157F(a), the Comptroller has the statutory authority to withhold issuance of the registration certificate, which is the dealer's license to sell gasoline in the Maryland retail market.

The law provides that these certificates "shall not be issued to retail service station dealers marketing motor vehicle fuel through retail outlets enlarged, altered, or structurally modified . . . unless the facilities contain enclosed work areas where service of motor vehicles is offered to customers," Md.Ann.Code, Art. 56, § 157F(a). The law further specifies certain types of repair services and parts to be offered at these retail service stations. However, exempt from its provisions are service stations which did not have enclosed work areas

prior to structural modification, or whose enclosed work areas had been closed for 30 days or more prior to July 1, 1977.

So long as an enclosed repair service area is maintained, the law does not prevent the conversion of a station to gas-only self-service islands. Indeed, since the passage of the Conversion Moratorium Law, such facilities are on the increase in Maryland.

The nub of the public concern is the loss of readily available emergency and maintenance repair facilities which have come to be traditional to the American service station.[3] The proliferation of gas-only self-service stations, led by Crown Central Petroleum Corporation and BP Oil, Inc., accentuated the public fear. This concern articulated by the Greater Washington/Maryland Service Station Association, Inc. was responsible for the enactment of the legislation, over the protest of the large oil refining companies.

## III.

In analyzing the respective claims presented here, the Court is governed by the general principle of law that the presumption of constitutionality attaches to the enactment of every state statute. *Alaska Packer Association v. Industrial Accident Commission,* 294 U.S. 532, 543, 55 S.Ct. 518, 79 L.Ed. 1044 (1935); *Salisbury Beauty Schools v. State Board,* 268 Md. 32, 300 A.2d 367 (1973). The burden is upon plaintiff to overcome this presumption.

### A. *Commerce Clause Claim*

Sun distributes its petroleum products in 35 states. Since Sun has no refining operation in Maryland its entire supply must flow through interstate channels to be marketed in this State. It has about 10,800 service stations throughout these 35 states, of which about 700 are gas-only. Plaintiff's Maryland operation consists of approximately 250 outlets marketing gasoline, of those 11 are gas-only. In 1977, Sun ranked seventh in total sales among the major oil companies distributing in Maryland.

3. The evidence at the trial indicated that of the reported 175,000 to 185,000 service stations in the United States, approximately 80% are full service operations.

The various types of stations which Sun operates throughout the country are: (1) full service stations; (2) gas-only with kiosk, no enclosed services bays (ground-up); (3) gas-only with boarded up service bays (poor boy); (4) convenience store/gas station; and (5) tune-up centers. Sun maintains that gas-only (ground-up) are its best volume sellers. But for the Conversion Moratorium Law, Sun claims that 22 stations would have been scheduled for conversion to gas-only (ground-up).

Sun contends that it is losing ground in competition with other major oil companies in its Maryland operation. Plaintiff presented evidence to indicate its efforts to better the company's competitive edge in the gasoline market in this State as well as throughout its national operation. Sun argues that the Conversion Moratorium Law stands as an obstacle to allowing the company to respond freely to competitive demands in its interstate market.

The heart of Sun's Commerce Clause claim is that, without the law, Sun would have sold an approximate additional ten million gallons a year in Maryland. This represents an additional $4,000,000 a year in total sales and approximately $400,000 a year in profits. Sun contends that this interference with its interstate operation violates the Commerce Clause of Article I, Section 8 of the United States Constitution, in that the law discriminates against interstate commerce.

In support of this contention, Sun alleges that certain of its stations are losing money by maintaining enclosed working areas, and that some of the dealers desire to convert to gas-only. There was evidence that of the 22 stations which Sun wishes to convert, twelve are producing less return than capital investment, and three are actually operating at a loss to the company.

Plaintiff also provided evidence that there are ample service facilities in the immediate vicinity of these 22 stations to provide adequate service to Maryland motorists, should the Conversion Moratorium Law be invalidated. The facilities include full service stations, tune-up centers, private mechanics, discount stores, automotive specialty shops and tire stores. However, defendants pointed out that these alternative service facilities are not in direct competition with Sun and could not afford the necessary protection, since they usually are not open in the evenings or on weekends. This argument goes to the State's rationale for enacting this bill, i. e., the emergency needs and safety of motorists using Maryland highways.

The expert witnesses produced by each side were in disagreement as to the effect upon gallonage projections directly attributable to the Conversion Moratorium Law. While there was some accord that gallonage losses were possible, the exact amount remained controverted. Sun claims the extent of the effect to be directly proportionate to the interstate commerce burden it asserts. However, no meaningful figures were produced as to gasoline retail sales at stations maintaining service bays but marketing gasoline through self-service only islands. Further, no evidence was presented as to other factors which might have caused the alleged losses for the 22 stations on which conversion was desired.

The thrust of Sun's Commerce Clause claim is whether the challenged statute discriminates against or unduly burdens interstate commerce. It is established that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atlantic & Pacific Tea Co., Inc. v. Cottrell,* 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976). The Supreme Court has long

> recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945).

*Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977).

In analyzing Sun's claim the Court must apply the Commerce Clause balancing test set forth by the Supreme Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).[4]

Where the statute regulates evenhandedly to effectuate a legitimate local interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [*Id.* at 142, 90 S.Ct. at 847]. (citations omitted).

*See Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Hunt v. Washington Apple Advertising Commission, supra.*

■ Preliminary to applying the *Pike* test, the Court recognizes that if Article 56, § 157F(a) of the Maryland Code were facially discriminatory against interstate competitors, the statute would be invalid without further inquiry. However, the provisions of the Moratorium Conversion Law apply equally to all dealers who desire to convert a service station in Maryland during the two-year moratorium. Therefore, no such discrimination is apparent. *See Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *Baldwin v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

■ The Supreme Court has recognized and discussed numerous kinds of burdens that may be classified as a "burden on interstate commerce." *See, e. g., Raymond Motor Transportation, Inc. v. Rice, supra; Hunt v. Washington Apple Advertising*

*Commission, supra; Pike v. Bruce Church, Inc., supra.* A careful review of the applicable cases to the facts at bar leads the Court to conclude that section 157F(a) does burden interstate commerce to a limited extent—in terms of increasing Sun's costs (and the costs of all other similarly situated oil companies) of doing business in this State. This added cost accrues when an oil company owning a full service station in Maryland must acquire land in order to change the full service operation to gas-only without enclosed service bays. Though the evidence indicated that it would be cheaper for a company to raze the existing service bays and construct a station with kiosk and gas islands, the law requires the acquisition of new land without service bays. An interstate commerce burden also could accrue through the loss of gallonage sales and possible diversion of gasoline sales near the State's borders.

Having found that section 157F(a) does impose a burden on interstate commerce, the burden though *de minimus* must be balanced against the benefits of the local interest. As the Supreme Court held in *Pike,* it is a question of degree. The overriding local interest in this case is the preservation of motorist safety on the Maryland highways. The State's concern is that emergency and normal automotive repair facilities will not be readily available if many more full service stations convert to gas-only operations. The Court finds the loss of automotive service facilities to be a legitimate local interest and amenable to State regulation. The balance is in favor of the local State interest.

The final step required under the Commerce Clause balancing test espoused in *Pike, supra* is the judicial determination of whether there is a less restrictive or less burdensome alternative to achieve the local State interest. Sun's expert witnesses[5] tes-

---

4. This Court previously discussed and applied this test in *Alexandria Scrap Corp. v. Hughes,* 391 F.Supp. 46, 59 (D.Md.1975), *rev'd,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (Kaufman, J.).

5. Both Dr. Charles Berry, Professor at Princeton University, and Dr. James M. Patterson, Professor at Indiana University, testified as to the impact and adequacy of the statute in question. Dr. Patterson spoke of lesser restrictive alternatives, but offered no constructive suggestions.

tified that there were less burdensome courses available to the Legislature, but the Court is not satisfied that this contention is correct. Moreover, plaintiff has not produced any concrete data on alternatives, but has merely surmised their existence. The Court concludes that Sun has failed to establish the presence of any less restrictive substitutes which would achieve the same results as the MCL. As the Court of Appeals of Maryland recently stated:

> [W]here reviewing legislation dealing with a serious problem in a new and untried fashion, the courts are under a special duty to respect the legislative judgment as to the proper means of solving the problem.

*Governor v. Exxon Corp.,* 279 Md. 410, 428, 370 A.2d 1102, 1112 (1977), aff'd, —— U.S. ——, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

## B. *Due Process Claim*

Sun alleges that various aspects of section 157F(a) deprive plaintiff of its property without due process and without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution. Sun bases this allegation on the following premises: (1) that Sun is not assured of a fair rate of return on the value of any facilities it is required to maintain; (2) that the Conversion Moratorium Law arbitrarily imposes on Sun the burdens of a "public utility"; (3) that the statute fails to make adequate provision for a meaningful hearing; and (4) that the statute is founded upon an irrebuttable presumption.

■■■ The first and second contentions are the crux of Sun's "public utility" argument. Sun states that the pertinent factual bases for this argument are apparent from the statute's language. Sun's witnesses theorized as to public utility burdens imposed on plaintiff. Apparently the basis for this argument is that Sun was required to maintain repair facilities for public benefit. However, defendants have established that the statute does not mandate the normal "public utility" requisites, such as price regulations, service without discrimination, or dedication of private property.

The law is well-settled on the property dedication aspect:

> [I]t is beyond the power of the State by legislative fiat to convert property used exclusively in the business of a private carrier into a public utility, or to make the owner a public carrier, for that would be taking private property for public use without just compensation, which no state can do consistently with the due process of law clause of the Fourteenth Amendment.

*Michigan Public Utilities Commission v. Duke,* 266 U.S. 570, 577–78, 45 S.Ct. 191, 193, 69 L.Ed. 445 (1925). *See also Frost Trucking Co. v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed.2d 1101 (1926). The question is whether the statute here either converts Sun's property to public use or places Sun in the position of a public utility.

It is not alleged, and the Court does not find, that Sun's property is converted to public use. Rather, Sun contends that the Conversion Moratorium Law imposes certain public utility-type obligations upon its business, and that in so doing, the law fails to assure Sun a fair rate of return on its operation. In essence, Sun is arguing that by forcing it to continue to operate at a loss, it is being deprived of its property without due process. *See Democratic Central Committee of District of Columbia v. Washington Metropolitan Area Transit Commission,* 141 U.S.App.D.C. 79, 436 F.2d 233, 235 (1970). Both this argument and the straight "public utility" argument are defective for the following reasons: Sun is not being forced to continue operations at any station; nor is it being required to continue in any lease agreement; nor is it being required to maintain repair services at any station it chooses to close. Sun is free to close any of its facilities not deemed profitable, and open a gas-only ground-up operation at any other location, as are all other oil companies and dealers.

Sun's reliance on the public carrier cases is not dispositive of the issue at hand. *See*

*Frost Trucking Co. v. Railroad Commission, supra; Railroad Commission v. Eastern Texas Railroad Co.,* 264 U.S. 79, 44 S.Ct. 247, 63 L.Ed. 569 (1924). A review of the public utility cases and the evidence before the Court in this case leads to the conclusion that section 157F(a) does not impose public utility obligations on Sun, or any other dealer operating under the law. The limitations placed upon the dealers by the statute are properly within the police power of the State. As this Court stated in *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission,* 400 F.Supp. 1369 (D.Md.1975):

> The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited. Indeed, even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied. [*Id.* at 1383].

*quoting from Miller v. Board of Public Works,* 195 Cal. 477, 484, 234 P. 381, 383 (1925).

One of Sun's persistent contentions is directed at a possible continuation of the Conversion Moratorium Law. Sun is concerned that the Maryland Legislature will extend the effect of the law beyond July 1, 1979. But the test is whether the statute has a reasonable relation to the legitimate State purpose of providing for the safety of the motoring public, not its legislative life.

■ Plaintiff's third Due Process contention concerns the adequacy of the hearing procedures established by the law. Subsequent to the filing of this action, defendant Goldstein promulgated amendments to section 03.03.07, Subtitle 03, Title 03 of the Code of Maryland Regulations (COMAR), providing for notice and hearing procedures. *Supra,* pp. 790–791. Sun argues, however, that the law should provide more detailed administrative procedures to determine whether the closing of the enclosed work areas at any given station would be detrimental to the purpose of the law. In essence, Sun seeks administrative machinery for a station-by-station evaluation in relation to its location and the public need. At the very least, the procedures sought by plaintiff would cause a race to the administrative board, and could possibly precipitate an immediate increase in the number of conversions. This would be the antithesis of the Conversion Moratorium Law which seeks a respite from the rapid changeover to the gas-only phenomenon and its effect on the motoring public. The Court concludes that the hearing procedures sought by plaintiff are unreasonable and unnecessary, since the procedures established by the COMAR amendments are sufficient to meet the constitutional Due Process requirements.

■ Sun's final Due Process challenge is that section 157F(a) establishes an irrebuttable presumption which is not universally valid. Sun asserts here that the blanket prohibition against conversion to gas-only operations is based on an irrebuttable presumption that every such conversion, regardless of the facts and circumstances of a change at a particular location, is detrimental to the legislative purpose. As established, the legislative purpose of the statute is the maintenance of motorist needs and safety on the State highways.

The Supreme Court has recently spoken on the law of irrebuttable presumptions. *See Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 376, 27 L.Ed.2d 383 (1971). In these cases, the Court held that certain irrebuttable presumptions are invalid where the facts assumed are not universally true, and where no opportunity for a hearing of individual cases is established. *See, e. g., Vlandis v. Kline, supra,* 412 U.S. at 453–54, 93 S.Ct. 2230. "Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments."

*Id.* at 446, 93 S.Ct. at 2233. The issue at hand is whether Sun has correctly identified the Conversion Moratorium Law as containing such a presumption. Again, however, the statute is a two-year moratorium and the prevailing test is one of reasonableness.

One of the main distinctions between the cited authorities and the instant case is that the factual situations there delineated the need for administrative hearing procedures. The facts here are not compatible with those dictating administrative hearings. Since the Court has held that the present hearing procedures of section 157F(a), as amended, are sufficient to meet Due Process requirements, a further discussion is unnecessary. Obviously, it was the legislative intent to maintain the numerical status quo of full service stations throughout the State for a two-year period, regardless of circumstances or location. The Court concludes that Sun's irrebuttable presumption claim is misplaced.

### C. *Equal Protection Claim*

Sun's last claim based on the Equal Protection Clause alleges that there is no rational basis for the separate classifications of service stations established by the challenged law. Plaintiff's primary concern is the law's requirement that Sun provide certain repair services to assure and promote highway safety, while other directly competing existing and new facilities are exempt from the statutory purview.

The Supreme Court has clearly established that:

Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). The Court perceives no such fundamental personal rights or suspect distinctions present in this case. The issue here turns on whether the challenged classifications are rationally related to a legitimate state interest. However, as the Court said in *Dukes,* "[s]tates are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Id.* See also *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

Sun produced evidence at the trial to show that the challenged classifications effectively favor certain oil companies, while discriminating against others. One of Sun's expert witnesses stated that the law precludes one sector of the retail gasoline market from an opportunity to compete, while at the same time shielding another from competitive response. In particular, Sun singled out Crown Central Petroleum Corporation, the only major oil company headquartered in Maryland, as receiving preferential treatment.

Following the Supreme Court's suggested three-step analysis for testing Sun's Equal Protection challenge of the statute, it would appear this Court should (1) determine whether the law does create any classifications, (2) and if classifications are found, determine whether the law embodies a legitimate state interest, and (3) then find whether the classifications are rationally related to the legitimate State interest.

Both sides agree that classifications are created by the Conversion Moratorium Law. Thus, the next question is whether the statute embraces a legitimate State interest. Sun produced testimony that there was no need for the statute, and that it dealt with a non-existent problem. Reliance in part was placed upon the statistical decrease in the number of reported gas-only stations in Maryland. Sun also presented the opinions of experts to support this contention. However, the Court accepts the testimony of the Chief of the Maryland Motor Fuel Inspection Program, Gasoline Tax Division, that the reports are not necessarily accurate

or reliable.[6] Defendants also submitted a report to support the need for the Conversion Moratorium Law, based on the dependence of Maryland motorists on full service stations.[7] Weighing all of the evidence, the Court finds that there is a legitimate state interest embodied in the statute.

■ Though Sun urges the Court to find otherwise, the Court concludes that the classifications established by the law are rationally related to the legitimate State interest. The classifications are directly related to the State's attempt to preserve the number of full service facilities in Maryland. The State sought to maintain the same availability of automotive services found on July 1, 1977 throughout the two-year period. The primary concern was not the number of gas-only stations being maintained during this period, since these stations are not directly involved with the issue of maintaining the emergency motorist services in question. The Legislature found the classifications necessary in order to insure maintenance of emergency repair facilities. Since the classifications are not purely arbitrary, but are founded on a rational legislative intent, the Conversion Moratorium Law does not violate the Equal Protection Clause. *See McGowan v. Maryland, supra.*

The Court is governed by the settled rule that "[u]nder the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963). "In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, . . . ." *New Orleans v. Dukes, supra* at 303, 96 S.Ct. at 2517.

The Court feels Sun has not overcome the presumption of legitimacy in the Maryland Legislature's action and, accordingly, the statute must be upheld.

## CONCLUSION

The Court finds that Sun has failed to meet its burden on any of the three constitutional issues raised. In light of the aforegoing findings of fact and conclusions of law, the Court further finds that the statute in controversy, Md.Ann.Code Art. 56, § 157F(a) of the Maryland Motor Fuel Inspection Law, as amended by Chapter 870 of the Laws of Maryland, 1977, and known as the Conversion Moratorium Law, is not violative of the Commerce, Due Process or Equal Protection Clauses of the United States Constitution.

A separate Judgment will be entered in accordance with this opinion.

## JUDGMENT

In accordance with the opinion of this Court entered today in the captioned case, IT IS, this 23rd day of June, 1978, ORDERED and ADJUDGED as follows:

1. That Md.Ann.Code Art. 56 § 157F(a) of the Maryland Motor Fuel Inspection Law, as amended by Chapter 870 of the Laws of Maryland, 1977, and known as the Conversion Moratorium Law BE, and the same hereby IS, declared constitutional.

2. That judgment BE, and the same hereby IS, entered in favor of the defendants, Louis L. Goldstein, Comptroller of the Treasury of the State of Maryland, Francis B. Burch, Attorney General of Maryland, and Sandra A. O'Connor, State's Attorney of Baltimore County, against the plaintiff, Sun Oil Company of Pennsylvania, with costs.

6. The testimony revealed there was much confusion as to the language of the questionnaires used with the renewal applications for certificates. This confusion may account for the unusual drop in the reported number of gas-only stations. Apparently the dealers were uncertain whether Poor-Boys and Self-Service were to be classified as Gas-Only.

7. The report, "Attitudes Toward Sources of Automobile Maintenance" was compiled by Professors Thomas J. Moronick and Ronald Stiff of the University of Baltimore, and was based upon the results of a questionnaire mailed to randomly selected Maryland motorists.