REQUESTED BY: Senator Merton L. Dierks Nebraska State Legislature
You have requested the opinion of this office concerning the authority of the State of Nebraska to impose a temporary moratorium on the construction and permitting of hog confinement facilities and associated waste handling systems, and constitutional issues to be considered to avoid defects in the legislation. You specifically asked the following two questions:
 1. Does the State of Nebraska have authority under the existing Nebraska Environmental Protection Act, the Federal Clean Water Act, or any other provision of law, to impose such a moratorium on permitting hog confinement facilities or any subcategory of the same. If so, under what conditions or justification may this be done?
 2. What constitutional considerations must be considered if the Legislature wished to impose a moratorium through legislation and how could legislation be drafted to avoid constitutional defects?
 Authority to Impose a Moratorium
If the State of Nebraska has the authority to impose a temporary moratorium on construction of hog confinement facilities, the authority would derive from the Legislature's ability to protect the public's health, safety, and welfare. The State, as a sovereign, has an inherent right to act in order to protect the public's vital interests, such as the health, morals, comfort, and general welfare of the people, known as the police power. See, e.g., Energy Reserves Group, Inc. v. Kansas Power Light Co., 459 U.S. 400 (1983); Home Building Loan Ass'n v.Blaisdell, 290 U.S. 393 (1934). A temporary moratorium would be based on the state's police power, to protect the public's health, safety, and welfare, as well as the state's environmental resources. The Legislature's authority would not be derived from state or federal law, including the Nebraska Environmental Protection Act or the federal Clean Water Act.
We are not aware of anything in the Nebraska Environmental Protection Act or the federal Clean Water Act of 1977 which specifically authorizes or proscribes moratoriums on livestock confinement facilities. The Clean Water Act (an amendment to the Federal Water Pollution Control Act of 1948) states that unless otherwise expressly provided, nothing in the chapter precludes states from adopting or enforcing requirements for the control or abatement of pollution. 33 U.S.C. § 1370(1). The only specified limitation is that state standards must be no less stringent than the federal standards. Id. The statute also states nothing in the chapter shall be construed to impair a state's rights or jurisdiction over the waters of that state.33 U.S.C. § 1370(2). We reviewed the federal regulations promulgated under the Clean Water Act to control pollution from swine and other livestock feedlots, located at 40 CFR, §§ 412.10 to 412.16 (1996). Our review of these regulations did not disclose any specific prohibition against temporary moratoriums.
It does not appear that the federal Clean Water Act or its related regulations directly address moratoriums on livestock confinement facilities. The issue then turns on what factors a court would consider when reviewing a challenge to a statutory moratorium enacted under the state's police power.
Constitutional Considerations When Reviewing Moratoriums
We point out that our review will be general in nature, since we do not have specific legislative language before us. We will attempt to address issues that parties challenging a moratorium are likely to raise. Before turning to specific factors, there are several general principles which should be mentioned.
One general principle of law is that courts view state statutes with a presumption of validity and constitutionality.Bridgeport Hydraulic v. Council on Water, 453 F. Supp. 942, 946
(1977), aff'd 439 U.S. 999 (1978); Sun Oil Co. of Pennsylvaniav. Goldstein, 453 F. Supp. 787, 791, aff'd 594 F.2d 859 (4th Cir. 1979); In re Application A-16642, 236 Neb. 671, 680,463 N.W.2d 591, 599 (1990). The Nebraska Supreme Court has stated, "In every constitutional challenge there attaches the presumption that all acts of the Legislature are constitutional with all reasonable doubts resolved in favor of constitutionality." Ottov. Hahn, 209 Neb. 114, 119, 306 N.W.2d 587, 591 (1981). The party challenging the statute has the burden to show that it is in fact unconstitutional. Sun Oil at 791; Haman v. Marsh,237 Neb. 699, 708, 467 N.W.2d 836, 844 (1991).
The enactment of a temporary moratorium on a business activity raises a number of potential areas which could form the bases for constitutional challenges. Our research indicates the following issues are often implicated when such legislation is enacted.
A. Contract Clause Issues
One potential constitutional issue which might arise if the moratorium were challenged is the impairments of contracts under the Contract Clause of the U.S. Constitution. This clause provides that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." U.S. Const. art. I, § 10, cl. 2. Many of the cases we found in which state moratoriums were challenged involved contract clause claims. Whether this constitutional provision would be implicated by the moratorium legislation you might propose would depend on the types of hog confinement facilities and waste handling systems the legislation affected, whether the facilities were proposed, under construction, or prepared to begin operations, and other similar factors.
The threshold inquiry to determine if the Contract Clause is implicated is whether the state law will in fact create a substantial impairment of contractual relationships. EnergyReserves Group, Inc. v. Kansas Power Light Co., 459 U.S. 400,411 (1983). Although the language used in the Contract Clause is absolute, the prohibition must be accommodated to the state's police power. Id. at 410. The severity of the impairment will increase the level of scrutiny with which a court will review the legislation. Id. at 411. It is not necessary that all contractual expectations be totally destroyed in order to find a substantial impairment, though. In determining the extent of the impairment, a court will consider whether the industry involved has been regulated in the past. Id. Livestock confinement facilities have been regulated by the Nebraska Environmental Protection Act, the regulations promulgated thereunder, and by the federal Clean Water Act and its accompanying regulations. This fact would appear to increase the chances that a moratorium would be upheld.
If it is determined that the legislation constitutes a substantial impairment of contract rights, the state must show that the legislation is based on a significant and legitimate public purpose. Id. at 411. Thus, the inquiry is "whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." HomeBuilding Loan Ass'n v. Blaisdell, 290 U.S. 398, 438 (1934). Such legitimate public purposes could include remedying general social problems, the state's economic interests, and the public's health, as well as other bases. In some early cases dealing with exercises of police powers which impaired contractual rights, such as the Blaisdell case, the U.S. Supreme Court found that the public purpose should address an emergency or temporary situation. The Court has since indicated an emergency or temporary situation need not exist in order to uphold statutes interfering with contract rights. Energy Reserves Group at 412.
Once a legitimate public purpose is identified, a court will determine whether the measures taken in the legislation are reasonable and appropriate to address the public purpose involved. Id. As previously mentioned, courts will view the statutes involved with a presumption of constitutionality. Also, when reviewing economic and social regulation, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Energy Reserves Group
at 413, quoting United States Trust Co. v. New Jersey,431 U.S. 1, 22-23 (1977).
The outcome of a court's review of moratorium legislation would therefore depend on the nature and seriousness of the public purpose requiring the action, the language used to create the legislation, and whether a moratorium is an appropriate manner in which to address the issue. The Legislature may therefore want to consider these factors when drafting legislation creating a moratorium.
B. The Commerce Clause
As with Contract Clause claims, we cannot ascertain for certain whether, or to what extent, the Commerce Clause might be involved in any challenges to a temporary moratorium on hog confinement facilities without reviewing specific legislation on that topic. Many factors would have to be considered, such as the specific restrictions placed on the facilities, precisely what types of facilities are involved, and the extent and nature of their operations.
When reviewing legislation to determine whether the Commerce Clause is implicated, it must first be determined whether the statute is facially discriminatory against interstate competitors of the businesses involved. Sun Oil, 453 F. Supp. at 793. To avoid this defect, the proposed legislation must apply equally to all similarly situated businesses. If it is determined the moratorium is not facially discriminatory, the legislation will be reviewed using a balancing test.
Under the balancing test, any burden on interstate commerce must be balanced against the intended local benefits to be brought about by the legislation. The final consideration is whether there is a less restrictive alternative available which would equally achieve the State's intended purposes. If less restrictive means are available, then those options must be attempted first.
The United States Supreme Court, in describing this balancing test, stated:
 Where the statute regulates evenhandedly to effectuate a legitimate local interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of burden that will be tolerated will of course depend on the nature of the local interest involved and on whether it could be promoted as well with a lesser impact on interstate activities.
Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).
For the legislation creating a moratorium to meet the above test, it must first be determined whether interstate commerce is affected. If it is, a legitimate state interest establishing the need for a moratorium would have to be identified and articulated. Once such a state interest is identified, it must be determined how significant the impact of the legislation will be on interstate commerce. The severity of the impact on interstate commerce will then be weighed against the importance of the state's local interest addressed by the legislation.
To avoid successful challenges based on commerce clause issues, the Legislature should ensure that the moratorium, and the means used to operate and enforce the moratorium, are the least restrictive and least burdensome alternatives available which will achieve the Legislature's objectives.
C. Due Process
Another issue to be considered when drafting moratorium legislation is the due process rights of the affected parties. These could take many forms, again depending on the statutory language. These considerations may be especially relevant if hog confinement facilities already in existence are affected, such as being temporarily proscribed from expanding or altering the facilities. Any facilities where construction has already begun might also be affected.
Parties wishing hearings to determine whether their operations constitute the type of facility controlled by the statute could challenge the moratorium. They might allege that hearings are required for each facility in order to determine whether it is a hog confinement facility under the statute, and whether that facility actually causes the type of harm the legislation is intended to temporarily abate. Whether such challenges would have any merit again depends on the legislative language.
In one case where such arguments were made, the court found that such hearings were not required. In the Sun Oil case, cited above, Maryland created a moratorium on allowing full service gas stations (with automobile repair facilities) to convert to gas only stations. The purpose was to ensure adequate automobile repair facilities existed to serve motorists operating on Maryland's roadways. Legislative action was deemed necessary due to the number of stations converting to gas-only and eliminating their repair shops. Although the moratorium prohibited stations from eliminating existing repair shops, it did not prohibit closing the station entirely, nor the building of new gas-only stations where none had previously existing. The court found that the requested hearings were unnecessary and unreasonable, since the provisions of Maryland's moratorium law were sufficient to meet due process requirements.
We note that the length of the moratorium is not a determining factor when reviewing the legitimacy of a moratorium. "[T]he test is whether the statute has a reasonable relation to the legitimate State purpose . . . not its legislative life."Sun Oil at 795.
In another case involving a moratorium, a city enacted a temporary moratorium on construction permits. In Tisei v. Townof Ogonquit, 491 A.2d 564 (Me. 1985), the stated purpose of the moratorium was to prevent overloading the town's public services, to lessen the strain on the town's water supply and sewer system, and to protect the town's soil. A committee was established to review the town's existing ordinances while the moratorium was in effect. In reviewing whether the moratorium was a proper exercise of the town's police powers, the court found that a municipality could use its police powers to withhold approval of new construction projects for a limited time. In determining whether the moratorium was within the town's police powers and did not violate due process requirements, the court used a three-step review process.
 1. The object of the exercise must be to provide for the public welfare.
 2. The legislative means employed must be appropriate to the achievement of the ends sought.
 3. The manner of exercising the power must not be unduly arbitrary or capricious.
Tisei at 569, citing to State v. Rush, 324 A.2d 748 (Me. 1974) (emphasis in original). Although the facts in the Tisei
case are not specifically what is before us with a statewide moratorium, the case may be analogous in that the court addressed a temporary construction moratorium imposed so that a governmental entity could study an issue before a more serious situation arose. The court in Tisei overturned the summary judgment the lower court had entered for the town. The test used by the court may provide a useful general guide when determining what factors should be considered in order to avoid due process violations.
D. Equal Protection
Another constitutional issue which should be considered when drafting legislation creating a moratorium is equal protection guarantees under the United States and Nebraska Constitutions.
When reviewing legislation challenged on equal protection grounds, it is clear that unless a legislative classification involves a fundamental personal right or inherently suspect class, such as race, alienage, or national origin, "courts will ask only whether a rational relationship exists between a legitimate state interest and the statutory means selected by the legislature to accomplish that end." State v. Garber,249 Neb. 648, 653, 545 N.W.2d 75, 79 (1996). See also Cleburne v.Cleburne Living Center, Inc., 473 U.S. 432, 440 (1985); NewOrleans v. Dukes, 427 U.S. 297, 303, (1976); State ex rel.Spire v. Northwestern Bell Tel. Co., 233 Neb. 262,445 N.W.2d 284 (1989). The Nebraska Constitution has identical requirements. Neb. Const. art. III, § 18; Robotham v. State,241 Neb. 379, 385, 488 N.W.2d 533, 539 (1992). Equal protection challenges brought under article III, § 18 of the Nebraska Constitution would likewise be tested for a rational basis unless a suspect classification was involved. Robotham at 385,488 N.W.2d at 539; Haman at 712, 467 N.W.2d at 846 (1991). If a rational relationship to a legitimate state interest is found to exist, a court will uphold the legislation. Garber at 653,545 N.W.2d at 79. The rational basis test for equal protection is violated "only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." Garber at 654,545 N.W.2d at 79, quoting McGowan v. Maryland, 366 U.S. 420, 425
(1961).
In order to evaluate equal protection claims, a court may use a three-step analysis: 1) whether the law creates classifications, 2) if classifications are created, whether the law embodies a legitimate state interest, and 3) whether the classifications are rationally related to that legitimate state interest. Sun Oil at 796. So long as fundamental rights and suspect distinctions are not involved, a court will examine these factors only for constitutionality — not on the wisdom, necessity, or strength of scientific support for the Legislature's policy decisions. New Orleans at 303,96 S.Ct. at 2517; Garber at 654, 545 N.W.2d at 79; Otto at 119,306 N.W.2d at 591. The Nebraska Supreme Court has stated that under the rational basis standard, a legislature is not required to adopt the best solution, only a solution which has a rational relationship to the state's interest. Garber at 654,545 N.W.2d at 79. When the legislation deals with economics and social welfare, equal protection is not violated merely because the classifications are imperfect or when in practice it results in some inequality. Otto at 118, 306 N.W.2d at 591, citingDandridge v. Williams, 397 U.S. 471 (1970).
Conclusion
The potential for constitutional and other legal issues which might arise from a temporary moratorium on hog confinement facilities are as varied as the possibilities for the language which would create the legislation. However, certain general issues are often involved in judicial reviews of moratoriums. One primary factor in a review of the constitutionality of any such legislation would likely deal with whether it addresses a legitimate state interest. It is therefore important to identify and articulate the State's interest and purpose justifying the legislation.
Another principle to consider is that legislation enacted pursuant to the state's police powers must have a real and substantial relation to a legitimate state purpose, and the means of enforcement must be reasonable. When exercising police powers, "the legislature has broad and flexible authority, particularly in the areas of public health and safety." BridgeportHydraulic at 946. Whether a court would uphold a temporary moratorium on hog confinement facilities depends on such factors as the legitimate state interest involved, the particular statutory language creating the moratorium, the declared purpose for the moratorium, and how the moratorium is to operate and be enforced. A court would consider these factors and decide whether a moratorium was a reasonable method to address the state's interests.
Because current Nebraska statutes and regulations control hog confinement facilities, it would be helpful if the Legislature distinguished why current statutes and regulations are inadequate, or why they are adequate for current facilities, but not for the new types of proposed facilities and waste handling systems. A distinction explaining how the new facilities differ and the public and/or environment would not be adequately protected by the current controls would assist a court reviewing these issues.
Although the foregoing discussion addresses several issues which have been raised by parties challenging statutory moratoriums, it is probably not a complete list of all bases upon which a moratorium might be challenged. We hope this brief analysis of these complex issues is of assistance when drafting legislation on this topic.
Sincerely,
 DON STENBERG Attorney General
 Timothy J. Texel Assistant Attorney General
cc: Patrick J. O'Donnell Clerk of the Legislature
APPROVED BY:
Don Stenberg
Attorney General