**DETROIT AUTOMOTIVE PURCHASING SERVICES, INC., et al.**

v.

**Blair LEE, Acting Governor of the State of Maryland, et al.**

**Civ. No. Y–76–1566.**

United States District Court,
D. Maryland.

Dec. 27, 1978.

Timothy J. Bloomfield, Washington, D. C., Andrew J. Graham, Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen., Ned S. Kodeck, Asst. Atty. Gen., Glen Burnie, Md., for defendants.

Stephen C. Winter, Robert J. Aumiller, Baltimore, Md., for intervenors-defendants.

JOSEPH H. YOUNG, District Judge.

This case arises as a constitutional challenge to the Maryland scheme for licensing automobile salesmen. Plaintiffs, Detroit Automotive Purchasing Services, Inc. (hereinafter "DAPS") and John F. Patti, a new vehicle "broker", maintain that the licensing provisions unconstitutionally prevent them from doing business in Maryland. Accordingly, plaintiffs seek declaratory and injunctive relief against Blair Lee, the Acting Governor of Maryland, Francis B. Burch, Attorney General of Maryland, and other state officials charged with enforcing the licensing scheme. The Automobile Trade Association of Maryland, Inc., a professional association of automobile dealers, and several individual dealers on their own behalf have been granted leave to intervene as intervenors-defendants, pursuant to Rule 24, F.R.Civ.P.

Plaintiffs argue that the licensing requirement, codified in Annotated Code of

Maryland, Transportation Article, § 15–101(e), and §§ 15–402 et seq., violates the following constitutional provisions: (1) the Commerce Clause of Article I and the Supremacy Clause of Article VI of the United States Constitution; (2) the Due Process and Equal Protection Clauses of the Fourteenth Amendment and analogous provisions of Article 23 of the Maryland Declaration of Rights; and (3) the guarantee of free speech in the First and Fourteenth Amendments.

Following a trial before the Court, judgment will be entered in favor of the defendants and the intervenors-defendants. All findings of fact and conclusions of law are made in accordance with Rule 52(a), F.R. Civ.P., whether or not specifically so stated.

## I. THE BACKGROUND FACTS

### A. THE CHALLENGED PROVISIONS

For more than 25 years, the State of Maryland has regulated the sale of automobiles through a comprehensive system of licensing, which requires the various parties in the chain of automobile distribution to obtain a license from the state in order to do business. See generally Aero Motors v. Adm'r, M.V.A., 274 Md. 567, 337 A.2d 685 (1975). This licensing system currently embraces automobile manufacturers and distributors, § 15–202(a), persons operating factory branches, § 15–202(b), dealers, §§ 15–302, et seq., and salesmen, §§ 15–402, et seq. In operation, this system of licensing often takes advantage of established industry practices to aid in policing the wholesale and retail market in Maryland.[1]

In this regard, automobile dealers play an important role in policing the conduct of motor vehicle salesmen. As a condition for obtaining a license as a vehicle salesman, an individual must either be a licensed dealer himself or employed by one. § 15–404(a). Moreover, an applicant for a salesman's license must submit a written statement by a licensed dealer certifying that the salesman has in fact been accepted as the dealer's employee, § 15–404(b), and the application must include the name and full address of the dealer, § 15–405(1). Finally, the issued license itself bears the name of the dealer by whom the salesman is employed, § 15–409(a), and the licensed salesman may not solicit sales for the benefit of any seller other than the licensed dealer named in his license, § 15–409(b).

This licensed dealer, clearly identified as a result of the licensing requirements for vehicle salesmen, is himself lawfully and professionally responsible for the conduct of the employee-salesman. Under § 15–109,[2]

---

1. In Aero Motors v. Adm'r, M.V.A., supra, the Maryland Court of Appeals acknowledged that various institutional arrangements within the automotive industry were conducive to the public welfare, and that the state licensing system recognized such beneficial arrangements. The court upheld the licensing requirement that new vehicle dealers be franchised by a manufacturer, making the following observations on the franchise system:

"The motor vehicle is a constantly changing product; each new model brings innovations and in many instances mechanical problems. The franchised dealer maintains the customers' good will and at the same time maintains the good will of the franchisor in its trade-mark, trade name or franchised vehicle. It is only through such franchise dealers that the purchasing public has resort to rectify manufacturing errors which mandate vehicle recalls in accordance with regulations of the national Department of Transportation.

The uncontroverted evidence . . . established that the new car customer, in order to protect his investment in a complex necessity of modern life, is required to rely upon the warranty issued by the manufacturer of the vehicle which can only be gratified through one of its franchised dealers who, unlike used car dealers, are required to possess the necessary expertise and to supply and maintain the proper tools, devices and equipment, including specially trained mechanics, in order to perform the services within the warranty of a particular make or model of car. The supervision exercised by the manufacturers over their franchised dealers, their insistence upon sufficient financial resources and the maintenance of a certain 'net worth,' together with the manufacturers' responsibility—with the dealer—assures a new car customer of a level of fiscal responsibility as a recourse in the event of dissatisfaction." [274 Md. at 579–80, 337 A.2d at 694–95. (Footnote omitted.)]

2. § 15–109. Grounds for refusal, suspension, or revocation of license.

the licensed dealer can, in some circumstances, lose his own license because of the misconduct of his employee. Thus, the dealer's interest in preserving the investment in a business dependent upon retaining a dealer's license serves as an incentive to monitor the practice of the employee-salesman. In this way, dealer supervision of salesmen augments the regulation of vehicle salesmen through formal MVA adjudication of customer complaints and the imposition of sanctions directly upon the salesman, either by revoking or suspending the salesman's license.

One may not act as a vehicle salesman without first obtaining a license. § 15–402. A "vehicle salesman" is defined by § 15–101(e) as any person who:

> (i) For a commission or other compensation, under any form of agreement or arrangement with a dealer, buys, sells, or exchanges or negotiates or attempts to negotiate a sale or exchange of an interest in a vehicle of a type required to be registered under Title 13 of this article; or

> (ii) Induces or attempts to induce any other person to buy or exchange an interest in a vehicle of a type required to be registered under Title 13 of this article and receives or expects to receive a commission or other compensation from either the seller or the buyer of the vehicle.

Thus, one who acts as a "broker" for a car purchase and thereby "induces or attempts to induce" a car sale in return for a fee qualifies as a new vehicle broker under this statutory scheme and is required to obtain a license.

In addition to any other grounds specified in this title for refusal, suspension, or revocation of a license, the Administration may refuse to grant a license under this title to any person and may suspend, revoke, or refuse to renew the license of any person if it finds that:
> (1) The person has violated or is attempting to violate any provision of this title or any rule or regulation adopted under this title;
> (2) The person has violated or is attempting to violate any of the other provisions of the Maryland Vehicle Law that relate to the business or activity of that person; or

## B. THE DAPS OPERATION

Plaintiff DAPS, a New Jersey corporation whose principal office is located in Cherry Hill, New Jersey, is engaged in an interstate business of training and assisting individuals to operate as "new vehicle brokers." Together with trained brokers such as plaintiff Patti, the parent corporation of DAPS known as Detroit Automotive Services, Inc. (hereinafter "DAS"), and a network of cooperating local dealers, DAPS provides a brokerage service through which consumers can purchase automobiles or trucks at a price slightly in excess of dealer cost.

Under the DAPS system, a consumer orders a new vehicle more or less directly from the manufacturer. In dealing through DAPS, the consumer reportedly avoids the hassle of going from one dealer to the next, dickering for the best available price on the best available vehicle. By agreement with DAS, various local dealers across the country contract to order new vehicles from their franchising manufacturer for DAPS clients and to deliver the vehicle to the client for a price equal to the factory invoice cost of the vehicle and the invoice cost of any optional equipment requested (the dealer cost), plus a so-called "make-ready" fee, which includes a predetermined dealer mark-up and a $50 service charge which the dealer subsequently forwards to DAS. This dealer mark-up, determined as a part of the agreement between DAS and the local dealer, can vary from as little as $75 for a relatively small-sized car to up to nearly $600 for a luxury model. Once the dealer receives delivery of the vehicle from the manufacturer, he deals exclusively with the DAPS client, through

> (3) Any officer, manager, agent, or employee of the person has violated or is attempting to violate any provision of this title, any rule or regulation adopted under this title, or any of the other provisions of the Maryland Vehicle Law that relate to the business or activity of the person, unless the Administration is satisfied that the individuals engaged in the management of the business or activity:
> (i) Had no knowledge of the wrongful conduct, or
> (ii) Were unable to prevent the violation or attempted violation.

whom the dealer arranges any financing for the vehicle, takes care of title transfer, handles the warranting and servicing of the vehicle, and collects state taxes on the sale.

The consumer interested in availing himself of DAPS's promised savings first contacts a DAPS broker. The customer explains to the broker his needs and preferences in an automobile. In turn, the broker provides whatever assistance he can offer through the detailed price information which DAPS supplies. In addition, the broker will often encourage the new car customer to shop around among the various dealers in the area to compare prices, to test drive models in which he might be interested, and to discuss further with the dealer any special concerns he may have about a particular make of car. When the DAPS client has decided upon the model and the optional equipment desired, he relates this choice to the broker. By adding the invoice cost of the vehicle and the cost of the optional equipment the client has chosen, including with this sum the pre-determined "make-ready" fee, the broker can quote the price the customer can expect to pay for his new vehicle through DAPS. If the price is agreeable, the customer executes an agreement with the broker, which authorizes the broker to act as the customer's agent in securing the order and delivery of the selected vehicle through one of the local car dealers affiliated with DAPS. The customer also turns over to the DAPS broker a deposit on the vehicle covering 5 per cent of the purchase price. The broker then sends this deposit along with a detailed description of the requested vehicle to DAS in New Jersey, where the request is processed and forwarded to an appropriate new car dealer located near the client's home. For example, should a DAPS client purchase a new Chevrolet through DAPS, his request for a new vehicle would be forwarded to a DAS-affiliated Chevrolet dealer located in the vicinity of the buyer. The local dealer then places the order with his franchising manufacturer, and upon delivery of the vehicle, personally consummates the sale with the DAPS client.

One may become a new vehicle broker for DAPS upon successful completion of a weekend training session at the DAPS headquarters in Cherry Hill, New Jersey and payment of a fee of $1950. DAPS supplies the broker with price lists detailing the information on every model of automobile or light truck manufactured in the United States, including the invoice cost of the model, the invoice cost of optional equipment compatible with it, the full specifications for each model, and its predetermined "make-ready" fee. The DAPS broker operates as an independent contractor affiliated with DAPS, rather than as a DAPS employee. The broker negotiates his own fee independent of DAPS and solicits his own clients, making his services available to the public either informally by word of friends and satisfied clients or through formal advertisements.

## C. THE UBS ACCOMMODATION

The United Buying Service (hereinafter "UBS"), a brokerage operation similar to DAPS, has been doing business in Maryland for approximately 10 years. Under the UBS system, clients are drawn from certain organizations affiliated with the buying service, rather than from the public in general. A UBS client desiring a new car requests a particular model by directly contacting UBS, either in person, in writing, or by phone. If the terms of purchase are agreeable, the client is issued a purchase certificate which entitles him to go to select dealers who will sell a car at $100 above the wholesale price of the vehicle. For every purchase which UBS facilitates, the local dealer advances UBS $30.

While operating initially in violation of the Maryland licensing requirements, UBS reached an accommodation with the MVA in 1972, in settlement of a law suit filed by UBS against the state. By the terms of this accommodation, UBS agreed to have its individual staff members licensed as vehicle salesmen. The local car dealers cooperating with UBS filed requests with the MVA to license UBS personnel as vehicle salesmen, submitting for this purpose the documenta-

tion required by law, including a salesman's bond and apparently the certification of the individual as the dealer's employee.

Despite testimony on this point by Oliver H. Folk, the principal force behind UBS, the relationship between the licensed salesmen at UBS and the dealer with whom each is affiliated for the purpose of satisfying state licensing requirements was never clearly delineated at trial. From Folk's description of the UBS operation, it is not apparent whether UBS, itself without a license as a vehicle salesman, actually refers clients to local dealers or whether its licensed personnel make referrals on their own behalf. It is also unsettled whether UBS licensed personnel routinely direct clients to a variety of local dealers or whether the staff member limits his referrals to the one dealer who licensed him as a vehicle salesman, as § 15–409(b) requires. While the trial testimony raises a question of whether UBS is now operating in literal compliance with the law, it is clear that in 1972, the MVA was satisfied that the structural changes proposed by UBS, if strictly followed, would render its continued operation lawful.

Plaintiff DAPS has attempted to reach an accommodation of its own with the MVA, by which it too could lawfully do business in Maryland. By the terms of its proposal, DAS service employees in New Jersey would be licensed as vehicle salesmen. These DAS service employees would process only those vehicle requests which could be filled by the dealer through whom each was licensed. For example, an order for a Chevrolet would be transmitted by a DAPS broker to the DAS service employee licensed by the cooperating Chevrolet dealer in the area. Under this proposal, which was rejected by the MVA, DAPS vehicle brokers would not be required to be licensed.

## II. THE LEGAL CLAIMS

Plaintiffs offer two theories in support of their claim under the Commerce Clause. First, they contend that the licensing provisions discriminate against out-of-state interests by shielding local car dealers from competition. Second, plaintiffs maintain that application of the licensing requirements to their operation excludes DAPS from the retail automobile market in Maryland and imposes such a burden on interstate commerce as to exceed any local interest upon which the licensing system may be premised. As an adjunct to the Commerce Clause claim, plaintiffs further argue that, since the effect of the licensing provisions is to protect local dealers from competition, the scheme conflicts with federal antitrust policies in favor of free competition. Accordingly, plaintiffs contend that the state licensing provisions must yield under the Supremacy Clause to an articulated federal policy.

In addition, plaintiffs argue that the state requirements impose upon them arbitrary restrictions and also discriminate against new vehicle brokers in violation of due process and equal protection. Plaintiffs assert that the licensing restrictions serve no legitimate purpose, since DAPS poses no harm or evil which the state might validly regulate. Rather, plaintiffs maintain that DAPS offers the public nothing but benefits, without disadvantage or detriment, in the form of savings on the purchase of automobiles. Finally, plaintiffs challenge the licensing requirements on First Amendment grounds, on the theory that the licensing law abridges their right to advertise their services to the public.

The defendants argue that the licensing requirement does not prevent DAPS from operating in the state, but merely requires the DAPS broker to obtain a license before doing business, like other salesmen. Thus, the defendants deny that the licensing scheme erects any economic barrier to interstate commerce in automobiles. Defendants further contend that the state's interest in monitoring the sale of automobiles legitimately extends to transactions involving DAPS, and that state licensing of DAPS brokers is neither arbitrary nor unjustifiably discriminatory.

## III. THE LEGAL ANALYSIS

It should be noted preliminarily that the licensing provisions in question en-

joy the same presumption of constitutionality which attaches to every state enactment. *Alaska Packers Association v. Industrial Accident Commission,* 294 U.S. 532, 543, 55 S.Ct. 518, 79 L.Ed. 1044 (1935); *Sun Oil Co. of Pennsylvania v. Goldstein,* 453 F.Supp. 787, 791 (D.Md.1978). Thus, it is incumbent upon the plaintiffs to demonstrate that the provisions which they challenge are constitutionally invalid. Having failed to meet this burden with respect to each of their claims, the licensing scheme must be upheld.

## A. THE COMMERCE CLAUSE CLAIMS

Initially, plaintiffs assert that the Maryland licensing requirements discriminate in favor of local dealers, maintaining that evidence of this alleged discrimination is the exclusion of a DAPS-type brokerage operation from the state retail market. Despite the fact that DAPS consistently underprices local dealers and offers consumers substantial savings on new car purchases, plaintiffs contend that the state's regulations preclude DAPS's operation in Maryland, promoting the interests of local dealers, and thereby shielding them from competition. Plaintiffs argue that under the present licensing scheme, dealers have been accorded complete discretion to determine who will be permitted to participate in the new car retail market, since, for a DAPS broker to be licensed as a vehicle salesman, he must either be a licensed dealer or employed by one.

■ Plaintiffs correctly assert that a statute which facially discriminates against out-of-state businesses or which protects and promotes local firms to the detriment of interstate commerce is unconstitutional without any further consideration. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977); *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). The record established at trial fails to sustain plaintiffs' argument.

The only evidence offered by plaintiffs to establish the discriminatory effect of the provisions is the testimony of Dr. Robert M. Swagler, a professor of consumer economics at the University of Tennessee. Dr. Swagler testified that licensing provisions in general have the incidental effect of retarding the growth of the occupational groups they regulate. However, the restrictive effect noted by Dr. Swagler may itself reflect nothing more than the unsurprising consequence that an economic regulation will favor those persons to whom it favorably applies.

Plaintiffs have failed to supplement this testimony with any evidence demonstrating that the discrimination inherent in the licensing of vehicle salesmen is in effect a discrimination against out-of-state commercial interests. The provisions require only that a licensed vehicle salesman be a licensed dealer or employed by one. Nothing in this requirement either discriminates against out-of-state businesses or protects local interests. The requirements are neutral in their effect on commercial interests both within and without Maryland. In addition, no evidence has been presented showing that the provisions are applied in anything but an even-handed manner.

If the licensing provisions discriminate in any way, it is not against any particular segment of commerce, but rather against a particular way of doing business, namely, the sale of automobiles by several dealers through the same sales agent. By extending the definition of vehicle salesman to embrace the so-called vehicle broker, the General Assembly implicitly acknowledged the fact that the vehicle broker acts as much, if not more, to the benefit of dealers as buyers, and that, as an agent facilitating car sales, he should be subject to the same qualifications as traditional salesmen. Accordingly, it required the vehicle broker to align himself to one licensed dealer, as it requires the traditional salesman.

■ It so happens that plaintiffs are involved in a business which seeks to take

advantage of the particular practice proscribed by the challenged licensing requirements. However, nothing about plaintiffs' type of enterprise inherently implicates interstate commerce so that the proscription of plaintiffs' desired way of doing business by the Maryland licensing provisions can be read as a discrimination against interstate commerce generally. Specifically, plaintiffs are involved in facilitating the sale of new cars, a purely intra-state concern. It is true that plaintiffs may operate in several states and their transactions may themselves implicate interstate commerce, but plaintiffs have failed to show that the provisions in question discriminate against them as out-of-state commercial interests. Nor have plaintiffs presented evidence that intrastate brokerage operations are afforded more favorable treatment under the licensing scheme. As the challenged provisions are neutral with respect to interstate commerce and are applied evenhandedly with regard to all segments of commerce, the provisions do not violate the Commerce Clause *per se*. *See Exxon v. Governor of Maryland*, 437 U.S. 117, 125–129, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Sun Oil Company of Pennsylvania v. Goldstein*, 453 F.Supp. at 793.

■ Plaintiffs argue that even if the licensing provisions are on their face neutral with respect to interstate commerce and are from that standpoint applied evenhandedly, the provisions are nevertheless unconstitutional because they unduly burden the flow of automobiles into Maryland. Plaintiffs invite the court to apply the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citations omitted), in assessing the constitutionality of the licensing requirement.

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the

question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Plaintiffs have expended much energy to demonstrate that the licensing of vehicle salesmen is a bankrupt concept as far as consumer protection is concerned, consumer protection being the local purpose served by the licensing provisions here. Moreover, plaintiffs have presented evidence that any legitimate interest in protecting new car purchasers from fraud or deception might be accomplished by measures which are less restrictive on plaintiffs' business.

■ On the basis of the cases decided after *Pike*, its balancing test currently reflects the law with respect to state interference with interstate commerce in violation of the Commerce Clause. *See Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440–42, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Great A & P Tea Co. v. Cottrell*, 424 U.S. 366, 370–72, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976); *Dixie Dairy Co. v. City of Chicago*, 538 F.2d 1303, 1307–08 (7th Cir. 1976), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976); *Sun Oil Co. of Pennsylvania v. Goldstein*, 453 F.Supp. at 793. However, in none of the cited cases, does the court proceed without first finding some burden on interstate commerce, however small. Indeed, it is axiomatic that no state provision can be invalidated as offending the Commerce Clause unless there is some demonstrated or apparent nexus between the challenged provision and interstate commerce.

The only evidence presented which suggests that the licensing of DAPS brokers in some way burdens interstate commerce is the testimony of Dr. Swagler. Testifying as an expert, Dr. Swagler opined that because DAPS can offer consumers new car prices lower than licensed dealers, and because the price of a new car is a determinant of the consumer's decision to purchase, the existence of a DAPS-type operation in Maryland will increase the volume of new

car sales in the state. On the basis of this expert opinion, the plaintiffs argue that a burdensome restriction on the operation of DAPS in turn burdens interstate commerce by retarding the flow of new cars into Maryland to meet the demand which DAPS would have generated. Plaintiffs submit that application of the current licensing requirement to DAPS brokers is a burdensome restriction on DAPS's operation. Thus, plaintiffs maintain that this showing is sufficient to establish that the licensing of DAPS brokers imposes a burden on interstate commerce and require the defendants to justify the provisions in satisfaction of the *Pike* balancing test in order to save the scheme from being struck down as unconstitutional.

█ While plaintiffs have made a showing tending to indicate that the licensing requirement in question imposes a burdensome restriction on DAPS and that DAPS's operation as a brokerage service may have a questionable impact on interstate commerce,[3] it does not immediately follow that the provisions thereby burden interstate commerce. A regulation which peculiarly burdens one firm in interstate commerce need have no restrictive effect on other interstate businesses or on interstate commerce generally. *See, e. g., Exxon Corp. v. Governor of Maryland, supra; Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951).

The only significant restriction which licensing imposes on the plaintiffs' business is that each DAPS broker align himself with the particular dealer through whom he is licensed. Consequently, the DAPS broker could lawfully procure for his client only those new vehicles available through that dealer with whom he is affiliated for licensing purposes. The service which each individual broker could offer the consumer would thus diminish due to this licensing requirement; however, this restriction on the individual broker need not effect DAPS's operation as a whole. While the licensing provisions prevent individual brokers from offering DAPS's promised savings on any American-made new car, the provisions would not prevent DAPS from offering the same savings on the same variety of vehicles through a network of licensed brokers, each individually aligned with a dealer participating in the DAPS operation. Plaintiffs contend that its current business structure, premised as it is upon the independent, unaffiliated broker, is entitled to constitutional protection under the Commerce Clause.

Ordinarily under the Commerce Clause, the structure, methods, and practices of a particular interstate business do not warrant protection from state regulation. Recently, in *Exxon Corp. v. Governor of Maryland, supra,* the Supreme Court reaffirmed the principle that "the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." 437 U.S. at 129, 98 S.Ct. at 2210. In *Exxon,* the Court upheld a Maryland law which prohibited oil refiners from operating retail service stations and required them to extend uniform "voluntary allowances" of gasoline to all stations they supplied. Even though the divestiture provision imposed severe burdens on certain interstate businesses, in some cases resulting in the withdrawal of several refiners from the Maryland market altogether, the Court expressly found that interstate commerce nevertheless remained unaffected.

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

437 U.S. at 127, 98 S.Ct. at 2214. The Court thereupon rejected the appellants' claim

---

**3.** *See, e. g.,* n.5, infra.

that, notwithstanding its effect on the movement of goods between states, the challenged provision was nevertheless unconstitutional because of its effect on the "structure" of the interstate market.[4] Thus, it follows from the holding in *Exxon* that, absent some showing that a state enactment inhibits the *flow* of goods or commodities in interstate commerce, the Commerce Clause does not compel the state to justify its action even though the provision may affect certain businesses or business practices in interstate commerce or alter the "structure" of the interstate market itself. *See also Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

The plaintiffs have failed to carry their burden of showing that the application of the Maryland licensing provisions to new vehicle brokers will result in a reduction in the number of new cars moving from outside the state into the state retail market. Rather, the record shows that at least one other brokerage concern, UBS, has operated within the state for some time without any ill effect from its efforts to comply with the licensing requirement. Further, plaintiffs' expert in consumer economics, Dr. Swagler, testified that the key factor in determining the consumer's decision to purchase a new car is its price, whereas the challenged licensing requirement affects only DAPS's ability to offer a full selection of American-made cars through a single broker. It follows from this testimony on the consumer appeal of DAPS that any increase in car sales generated by DAPS would be attributable to the promise of low prices rather than the prospect of dealing exclusively with one person throughout the process of selecting a new vehicle. Indeed, the DAPS client would not necessarily enjoy even this convenience, since DAPS clients are encouraged to shop around among various dealers before arriving at a final decision on a car purchase. Finally, plaintiffs have presented no evidence that DAPS's operation in accordance with the challenged licensing scheme would cause DAPS to raise the low prices it would otherwise offer consumers.

Plaintiffs argue that the provisions in question unconstitutionally restrict the movement of new cars into the state by reducing the volume of new car sales through its impact on plaintiffs. However, the trial record fails to demonstrate that the provisions have an effect on the plaintiffs which bears in any way on interstate commerce. Absent some indication that licensing new car brokers would cause plaintiffs or any other brokerage operation to generate fewer car sales than they would generate were they free of a licensing requirement, the challenged provisions cannot be found to diminish the effectiveness of the brokerage service as a mover of new cars in interstate commerce. Consequently, with no demonstrated nexus between the challenged licensing scheme and interstate commerce, the plaintiffs's claim under the Commerce Clause cannot be sustained. *See Exxon Corp. v. Governor of Maryland, supra; Hughes v. Alexandria Scrap Corp., supra.*[5]

---

4. The appellants in *Exxon* contended that the Maryland divestiture law affected interstate commerce by weakening the independent refiners thereby changing the structure of the interstate market. The court rejected this argument, refusing to "accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." 437 U.S. at 127, 98 S.Ct. at 2215 (citation omitted).

5. One particular aspect of the challenged provisions' allegedly restrictive effect on DAPS's ability to generate new car sales was not specifically addressed by plaintiffs' proof at trial. Under DAPS's operation, a broker in one state may arrange for new car purchases through

dealers located in either a neighboring state or in Detroit. These dealers would not be licensed in Maryland, unless they could satisfy the location and service requirements of § 15–304, Transportation Article, which provides as follows:

§ 15–304. Location and service requirements.

(a) *In general.*—A person may not be licensed under this subtitle unless:

(1) Except as provided in subsection (b) of this section, the business to be conducted under the license is the only or principal business conducted from the fixed location specified in the application;

(2) That business is conducted from a building that is adequate and appropriate for the

sale of the vehicles that may be sold under the license; and

(3) That business either:

(i) Maintains and operates an automotive repair facility equipped for reasonably adequate and proper servicing of the vehicles to be sold by it; or

(ii) Has an existing contract, approved by the Administration, that requires the contractor to service, at a reasonably convenient location, the vehicles to be sold by the business.

(b) *Exception.*—As to trailers, semitrailers, or motorcycles, the sale of these vehicles need not be the only or principal business conducted from the fixed location, but shall be subject to any reasonable location requirements determined by the Administration by rule or regulation. (An.Code 1957, art. 66½, § 5–107; 1977, ch. 14, § 2.)

Assuming *arguendo* that the location requirement is intended or enforced to permit only those dealers satisfying the provisions of § 15–304 with facilities located in Maryland to qualify as licensed dealers, this requirement effectively limits brokering to dealers or the employees of dealers with facilities located in the state. Consequently, even if plaintiffs were to comply with the licensing provisions for vehicle salesmen through a system of brokers, each of whom is associated with a single licensed dealer, DAPS's brokers in Maryland could no longer generate car sales outside the state. To the extent that the licensing requirement restricts sales outside of Maryland produced by DAPS's activity within the state, a sufficient burden would be shown on interstate commerce to require a balancing of the local interests promoted by licensing against its restriction on interstate commerce. *See Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. at 352–53, 97 S.Ct. 2434; *Pike v. Bruce Church, Inc., supra; Sun Oil Company of Pennsylvania v. Goldstein*, 453 F.Supp. at 793.

On the basis of the record, the Court cannot conclude that the burden on interstate commerce imposed by the location requirement clearly exceeds the legitimate local interest which it serves, nor can the Court find that this interest may adequately be served by a less restrictive measure.

First, the restrictive impact of the requirement on interstate commerce, through its effect on plaintiffs, is minimal. It should be noted preliminarily that plaintiffs do not actually sell automobiles themselves, but only facilitate such sales. The dealer, having availed himself of DAPS's services, sells the particular vehicle ordered through a DAPS broker. Thus, DAPS is not directly responsible for moving any commodity in interstate commerce. Unless DAPS can generate for its affiliated dealer more sales than the dealer can otherwise generate for himself, interstate commerce remains unaffected, since no greater number of automobiles is caused to move in commerce.

On the evidence presented, plaintiffs' ability to generate car sales is attributable to its ability to offer new car prices which are lower than those prevailing among the established dealers. However, where a vehicle sold through DAPS is for a price which the dealer could either match or beat, the vehicle sold through DAPS would not be evident of DAPS's impact on interstate commerce, since with or without DAPS's reduction in price, the sale conceivably would have been made by the dealer due to prevailing market forces. Indeed, every dealer who testified stated that depending upon conditions of demand, DAPS's prices could be matched or bettered by the established market dealers. Consequently, not every sale generated by DAPS will account for the movement of a vehicle in interstate commerce due to the activities of plaintiffs. Furthermore, the evidence fails to show that the particular transactions of interest, namely, the sale through out-of-state dealers, would account for anything more than a token proportion of DAPS-assisted sales, and not even all of these sales would evidence DAPS's effect on interstate commerce.

Nor can it be concluded from the record, even in view of the dealer location requirement, that compliance with the licensing scheme would decrease the number of DAPS assisted sales outside of Maryland, nor need it appreciably increase DAPS's overall cost of operation. The location requirement does not go so far as to prohibit Maryland residents from leaving the state to purchase new cars from out-of-state dealers, nor does it penalize such sales. The provision does not prevent the out-of-state dealer from advertising to the public generally to solicit sales. However, this requirement, together with the licensing provisions for vehicle salesmen, obliges the out-of-state dealer to make *all* arrangements for a specific sales transaction outside of Maryland. Although it requires interested customers to leave the state in their search for bargains from out-of-state dealers, the location requirement imposes no appreciably greater inconvenience on the DAPS client than would be otherwise necessary under DAPS's normal operation. Even though a client placed an order through a DAPS broker in one state, the customer would have to travel to the state where the dealer was located to pay for the vehicle and accept delivery. Thus, where the transaction necessarily involves a client at least willing to leave the state to effect delivery of a purchased vehicle, the additional requirement that he first leave the state in order to finalize arrangements with an out-of-state DAPS broker is not burdensome.

The apparent purpose of incorporating this dealer location requirement in the licensing scheme for vehicle salesmen is to prevent unlicensed, out-of-state dealers from avoiding the state dealer requirements by initiating sales contacts in Maryland but completing the transaction in another state. Accordingly, the ques-

## B. SUPREMACY CLAUSE CLAIM

■ The Court's disposition of plaintiffs' claim under the Commerce Clause effectively disposes of the plaintiffs' Supremacy Clause argument that the challenged provisions conflict with the pro-competitive policies of federal anti-trust law. Once again the trial record fails to sustain the factual assumptions upon which plaintiffs premise their argument. The challenged licensing provisions are neutral on their face with respect to the various participants in the automotive retail trade and in no way function to shield any participant from competition. Plaintiffs disingenuously argue that the licensing requirement in effect gives licensed dealers complete discretion to determine who will be allowed to participate in new vehicle transactions in Maryland, since this argument totally ignores the peculiar symbiosis of DAPS and the local dealers associated with it. As the brokerage system is structured, DAPS relies entirely upon the local dealers to provide automobiles and other related services for its clients. Indeed, DAPS may do very little other than ride on the coattails of the licensed dealer, and the fact that DAPS can exist at all would certainly belie the threat of any anticompetitive animus on the part of local dealers generally.

Plaintiffs' arguments totally misconstrue the competitive involvement of DAPS with local dealers. DAPS does not directly compete with anyone, except perhaps other brokerage operations. However, DAPS is indirectly involved in the competition between the DAPS-affiliated dealer and the dealer not affiliated with DAPS. It owes its existence to the competition among dealers, as its promised volume sales would give some dealers a competitive edge which others would lack. Thus, it can be said that DAPS profits from the competition among local dealers. Consequently, unless the licensing requirement effectively curbs that competition, the provisions have no adverse effect on DAPS from the standpoint of an effect on competition within the retail market. Since the statutory scheme clearly does not shield the licensed dealer from the competition of other licensed dealers, the provisions challenged have no practical impact on DAPS's ability to compete in the retail market.

■ Even if the licensing requirement were shown to have an anti-competitive

---

tion presented is whether the policies supporting this location requirement are sufficient to justify its impact on interstate commerce through application of the Maryland licensing requirement on plaintiffs.

In the context of the present case, principal justification for this requirement is to assure that new vehicles bought through purchase arrangements made in Maryland are merchantable and safe. Each of the dealers who testified at trial stated that new cars delivered from the factory are not in road-ready condition and require additional maintenance to put them in order. Plaintiffs concede that they rely on the dealers affiliated with their operation to perform such maintenance for their clients. The state's interest in protecting the consumer in the sale of automobiles has been extensively discussed by the Maryland Court of Appeals in *Aero Motors v. Adm'r, M.V.A., supra,* and the state achieves this objective by maintaining leverage over the dealer and his facilities through the state licensing agency. This control is effectively maintained by state regulatory authorities over those dealers and over those facilities located within Maryland.

The relevant provisions here would require vehicle salesmen to solicit sales only for those dealers who have, in Maryland, adequate facilities to maintain and service the cars they sell. Although the testimony disclosed that any dealer franchised to sell a particular make of car was obliged to service the car pursuant to the manufacturer's warranty after sale, only the dealer making the sale would be responsible for preparing the vehicle adequately for use after delivery from the factory. The Court concludes that the interest of Maryland in assuring that dealers have satisfactory facilities for pre-sale servicing of new vehicles is sufficient to justify the minimal burden this location requirement may impose on interstate commerce by restricting DAPS's ability to generate out-of-state sales. Further, plaintiffs offer no concrete alternative which is any less restrictive than the present scheme and which achieves the same results. On balance, the Commerce Clause would not compel invalidation of this licensing scheme even if state authorities were to read the location requirement of § 15–304 to refer only to facilities located in Maryland. *Cf. Sun Oil Company of Pennsylvania v. Goldstein,* 453 F.Supp. at 793–94. However, plaintiffs do not complain that the location requirement has been so applied or that it may be applied in the future.

impact, this fact alone would not invalidate the provisions. A state economic regulation which is reasonably related to a legitimate purpose is not invalid merely because it may conflict with the policies of the Sherman Act or any other relevant federal provision, absent some indication that Congress sought to preempt the kind of state regulation in question. *Exxon Corp. v. Governor of Maryland,* 437 U.S. at 130–136, 98 S.Ct. at 2216–2219; *Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847, 857 (N.D.Cal. 1978).

■ The provisions in question do nothing more than require that those persons who induce or attempt to induce automobiles sales obtain a license from the state. Its relevance to federal anti-trust policy by its effect on competition in the retail market has been shown to be remote at best, if at all. Accordingly, the Court can find no expression in federal anti-trust law of a Congressional intent to preempt state regulation of automobile salesmen. *Compare Murphy Tugboat Co. v. Crowley,* 454 F.Supp. at 857–58 (California provision entitling competitors to treble damages for firm's sale in interstate transactions of goods below cost overturned as penalizing legitimate price competition protected by the Sherman Act.) In circumstances like those presented by the instant challenge to the Maryland licensing scheme, invalidation of state provisions on the basis of federal anti-trust policy would, to paraphrase the *Exxon* Court, effectively destroy the power of states to engage in economic regulation. 437 U.S. at 136, 98 S.Ct. at 2219. The *Exxon* decision is controlling, and plaintiffs' claim under the Supremacy Clause cannot be sustained.

## C. SUBSTANTIVE DUE PROCESS CLAIMS

Plaintiffs' various attacks on the Maryland licensing provisions are fundamentally substantive due process claims in other guises. Plaintiffs' principal argument against the provisions is that there is no need for their application to new vehicle brokers. None of the parties disputes that the purpose of the state licensing scheme is to protect consumers from fraud and deception at the hands of new vehicle salesmen. Plaintiffs, however, contend and sought to prove at trial that salesmen are not the source of problems in vehicle transactions involving new cars. Rather, plaintiffs contend, it is the used car salesman who poses the real threat to consumers. Further, plaintiffs maintain that where there are problems in the sale of new cars, it is usually the dealer who is guilty of wrongdoing. Therefore, dealers are not effective supervisors of salesmen, contrary to the assumption upon which the licensing scheme is in part premised. Finally, plaintiffs argue that DAPS brokers are engaged in a useful occupation and that they are capable of performing a service to Maryland consumers which is susceptible to less restrictive regulation.[6]

■ Where an economic regulation is challenged under the Fourteenth Amendment on substantive due process grounds, the regulation will not be overturned as long as "there is an evil at hand for correction, and . . . it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). In subjecting a provision to this 'rational basis' test, it has been repeatedly held that the Due Process Clause does not transform the Court into a "super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Daybrite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952); *see also Exxon Corp. v. Governor of Maryland,* 437 U.S. at 124, 98 S.Ct. at 2212; *Ferguson v. Skrupa,* 372 U.S. 762, 731, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

---

**6.** As reflective of a less restrictive regulation of vehicle brokers, plaintiffs cite House Bill 1759, which was introduced in the Maryland General Assembly during its 1978 session. By the terms of this provision, new car brokers would be licensed directly by the state, irrespective of any connection with a licensed dealer. The legislation was never reported out of committee, and consequently, was never enacted by the General Assembly.

■ There can be no dispute that Maryland may legitimately legislate to protect consumers from fraud and deception in new car sales occurring within the state. *See generally Ferguson v. Skrupa,* 372 U.S. at 730–31, 83 S.Ct. 1028, 10 L.Ed.2d 93; *Williamson v. Lee Optical Co., supra; Brenner v. State Bd. of Motor Veh. M. D. & S.,* 413 F.Supp. 639, 643–44 (E.D.Pa.1976). However, the narrow question presented is whether the Maryland General Assembly may rationally include DAPS brokers within its scheme for regulating new vehicle salesmen if, as plaintiffs assert, new vehicle brokers are involved in none of the injurious practices which the licensing scheme was designed to eliminate.

The record supports certain conclusions relative to the involvement of vehicle brokers in consumer abuses. On the basis of the records of the MVA, consumers lodge few complaints against salesmen generally, and those complaints often involve the dealer's complicity with the salesman. In addition, the MVA records show that no consumer complaint has been filed concerning the conduct of DAPS brokers or UBS brokers. However, several automobile dealers testified that they have responded to consumer complaints about their salesmen without ever reporting the matter to the MVA.[7] Consequently, the record of consumer complaints compiled by the MVA is not necessarily an exhaustive record of consumer dissatisfaction with new car salesmen. In addition, the UBS operation is significantly different from that of DAPS; thus, the absence of consumer complaints concerning UBS brokers is hardly indicative of the honesty of DAPS brokers, since the UBS broker takes no money from his client while the DAPS broker does. Indeed, William J. Filandino, Jr., the vice president of DAPS, admitted that DAPS has no way of prohibiting its brokers from absconding with the money a client is asked to give the broker as a deposit on the vehicle to be purchased. Moreover, Filandino admitted that absent the client's complaint, DAPS would not even know such an abuse had occurred. Accordingly, the record is far from conclusive in showing the DAPS broker innocent of any injurious practice against the consumer.

■ Even if the record gave the DAPS broker a 'clean bill of health,' plaintiffs' burden under its substantive due process claim still would not be met. The question presented by plaintiff's substantive due process challenge is not whether new vehicle brokers are indeed innocent of any injurious act which the state may legitimately legislate against, but, rather, whether the brokers are so incapable of committing such injurious acts, that regulating their conduct would not rationally correct an existing evil. *See generally Ferguson v. Skrupa, supra; Olsen v. Nebraska,* 313 U.S. 236, 246–47, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); *East Hartford Ed. Ass'n v. Bd. of Ed. Etc.,* 562 F.2d 838, 852 (2d Cir. 1977). The Due Process Clause, does not prohibit states from anticipating and addressing problems which have yet to manifest themselves, as long as the problem is at least rationally conceivable. In *Olsen v. Nebraska,* the Supreme Court expressly affirmed this principle in upholding a Nebraska statute which fixed the maximum compensation which a private employment agency might collect. In view of the competition in the market for employment services and the sophisticated nature of the appellants' clientele, appellants maintained, as the plaintiffs have argued in this case, that there is no need for protective legislation concerning their activities. The *Olsen* Court dismissed the argument, observing:

We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which "should

---

7. Charles Fenwick, of Towson Valley Motors, Hunt Valley Ford, and Timonium Toyota, testified that on at least one occasion he discharged one of his salesmen for withholding a deposit left by a customer, and that he did not report the incident to the MVA. Matthew C. Fenton, III, of Chesapeake Cadillac, testified that he had encountered three or four dishonest salesmen in his experience as a dealer, and that none of these was reported to state licensing authorities.

be left where . . . it was left by the Constitution—to the states and to Congress." . . . *There is no necessity for the state to demonstrate before us that evils persist* despite the competition which attends the bargaining in this field. [313 U.S. at 246, 61 S.Ct. at 865 (citation omitted) (emphasis supplied.)]

■ With regard to the Maryland licensing provisions, the Court cannot conclude that the General Assembly acted irrationally in extending the licensing requirement for new vehicle salesmen to the so-called new vehicle broker. Given the complexity of the automobile and its expense as a commodity, it is not irrational to anticipate and address the occurrence of fraud and deception in automobile sales. Nothing plaintiffs have presented has shown new car brokers to be any less capable of dishonesty than new car salesmen. In addition, the availability of less restrictive measures, *i. e.,* House Bill 1759, has long ago ceased to be a relevant consideration in the context of a substantive due process challenge to economic legislation since the *Lochner, Coppage,* and *Adams*[8] line of cases was abandoned in *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Finally, the particular remedy chosen by the General Assembly, a system of licensing vehicle salesmen through licensed dealers, cannot be shown to be an irrational way of addressing the problem of consumer abuse in the sale of automobiles. To the extent that the licensed dealer provides added supervision of the vehicle salesman, the licensing provisions challenged may be a more effective regulation of the broker's conduct[9] than the system of direct licensing

and bonding proposed in House Bill 1759 and advocated by the plaintiffs. The evidence and the arguments offered by the plaintiffs at trial would be more compelling if they were addressed to the Maryland General Assembly rather than a federal district court. Whether or not it is effective legislation, the licensing scheme does not offend the Due Process Clause of the Fourteenth Amendment, and plaintiffs' claim thereunder cannot be sustained.

■ Plaintiffs also argue that the licensing requirement may be in violation of the Due Process Clause of Article 23 of the Maryland Declaration of Rights. The Maryland Court of Appeals has held that the Due Process Clauses of the Fourteenth Amendment of the federal Constitution and the Maryland Declaration of Rights are not synonymous. *See Aero Motors v. Adm'r, M.V.A.,* 274 Md. at 587–88, 337 A.2d at 699. The *Aero* Court distinguished judicial construction of the two provisions as follows:

> The decisions of the Supreme Court appear to uphold the validity of a regulation as within the exercise of the "police power" and hence not a denial of "due process" if the statutory enactment is based on any reasonable consideration affecting the public welfare. *See Nebbia v. New York,* 291 U.S. 502, 538–39, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). As pointed out in our decisions [citations omitted] we have followed the "traditional" test formulated in *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894)

**8.** *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915); *Adams v. Tanner,* 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336 (1917); *see also Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1984); Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923).

**9.** The pertinent restriction which requires a licensed broker to be "employed" by a licensed dealer and act as a vehicle salesman for only him, § 15–409(b), can be rationally justified as facilitating the informal supervision of vehicle brokers by licensed dealers. In argument be-

fore the Court, counsel for the defendants suggested that the one-dealer-one-salesman rule was in part designed to facilitate the collection state excise taxes on automobile sales, since it could then be efficiently ascertained who sold the automobile without a burdensome determination with each sale of whom the salesmen happened to represent when he made the sale. Analogously, the one-dealer-one-salesman rule conceivably functions to avoid confusion among dealers concerning who will have the legal responsibility for supervising the conduct of a salesman on a given transaction.

and followed in *Goldblatt v. Hempstead,* 369 U.S. 590, 594–95, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), requiring that a "real and substantial relationship" to the object sought to be attained by the statutory regulation be shown. *See also Blum v. Engelman,* 190 Md. 109, 115, 57 A.2d 421, 423 (1948).

274 Md. at 587–88, 337 A.2d at 699. This distinction did not prevent the same Court from holding:

> This Court has pointed out on numerous occasions that the test for constitutionality of regulatory legislation under the Due Process Clause is whether the statute, as an exercise of the state's police power, "bear[s] a real and substantial relation to the public health, morals, safety and welfare of the citizens of the State." [citations omitted] However, in applying this test the courts perform a very limited function. Unless the exercise of the police power by the Legislature is shown to be arbitrary, oppressive or unreasonable, the courts will not interfere with it. *Bowie Inn v. City of Bowie, supra,* 274 Md. [230] at 236, 335 A.2d 679; *Salisbury Beauty Schools v. St. Bd., supra,* 268 Md. [32] at 48, 300 A.2d 367. *Moreover, the wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. Bowie Inn v. City of Bowie, supra,* 274 Md. at 236, 335 A.2d 679; *Sav-A-Lot [Maryland Bd. of Pharmacy v. Sav-A-Lot, Inc.], supra,* 270 Md. [103] at 106; 311 A.2d 242; *Salisbury Beauty Schools v. St. Bd., supra,* 268 Md. at 48, 300 A.2d 367.

*Westchester West No. 2 v. Montgomery County,* 276 Md. 448, 454–55, 348 A.2d 856, 860 (1975) (footnote omitted) (emphasis supplied.) The highlighted portion of the Maryland court's holding is hardly distin-

guishable from the test which the *Aero* Court identified with judicial construction of the federal Due Process Clause. Thus, the distinction between the Maryland "real and substantial relationship" test and the federal "rational basis" formulation may not be entirely meaningful. There may be a hypothetical set of facts upon which a statute would be upheld as to a federal due process challenge but overturned upon application of the Maryland provision. This is not the case on the basis of the record presented. Plaintiffs' due process claim under Article 23 of the Maryland Declaration of Rights is no more meritorious than their due process challenge under the federal Constitution. *See Governor v. Exxon Corp.,* 279 Md. 410, 423–29, 370 A.2d 1102, 1110–13 (1977), *aff'd on other grounds,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

## D. EQUAL PROTECTION CLAIMS

Plaintiffs advance two theories for invalidating the Maryland licensing scheme under the Equal Protection Clause of the Fourteenth Amendment and an analogous doctrine reflected in Article 23 of the Maryland Declaration of Rights.[10] First, plaintiffs contend that the challenged provisions discriminatorily subject new vehicle brokers to restrictive regulation. Second, plaintiffs argue that they are victims of selective enforcement of the licensing provisions, since the MVA rejected a DAPS proposal which was "similar" to the accommodation which permits UBS to operate lawfully in the state.

Unlike the situation encountered with respect to plaintiffs' due process claim, the relevant state and federal constitutional provisions regarding equal protection are afforded the same judicial construction. *See Governor v. Exxon Corp.,* 279 Md. at 438, n. 8, 370 A.2d at 1118, n. 8. Accordingly, doctrine applicable to the Equal Protection Clause of the Fourteenth Amendment is also applicable to interpretation of Arti-

---

**10.** While Article 23 of the Maryland Declaration of Rights does not contain express equal protection language, Maryland courts however construe its due process clause in the same way the Fifth Amendment Due Process Clause

was construed in *Bolling v. Sharpe,* 347 U.S. 497, 75 S.Ct. 753, 99 L.Ed. 1083 (1954), to impose an equal protection requirement on the federal government. *See Governor v. Exxon,* 370 A.2d at 1118, n. 8.

cle 23 of the Maryland Declaration of Rights.

■ In reviewing legislative choices in the field of economic regulation, courts are no more willing to resort to equal protection doctrine than an analysis under due process. Unless a provision draws a classification which implicates fundamental personal rights or is based upon an inherently suspect distinction such as race, religion, or alienage, the classification will be upheld unless it can be shown that the classification is not rationally related to a legitimate state interest. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *McGowan v. State of Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Governor v. Exxon Corp.,* 279 Md. at 439, 370 A.2d 1102; *Aero Motors v. Adm'r, M.V.A.,* 274 Md. at 574–79, 337 A.2d 685. Having determined that the challenged licensing scheme is rationally related to a legitimate state interest for the purpose of due process, the initial equal protection argument that the licensing requirement impermissibly discriminates against new vehicle brokers has no validity.

Nor is it necessary to consider plaintiffs' claim of selective enforcement of the licensing provisions. First, the proposal made by DAPS to the MVA to secure official blessing of its operation in Maryland was critically different from the proposal made by UBS which the MVA accepted. Under the DAPS proposal, only the DAPS employees at the service's New Jersey headquarters would be licensed as employees of various local dealers. The DAPS broker would remain unlicensed. Given these terms, the MVA's rejection of the DAPS proposal is not unreasonable. The DAPS broker is the only DAPS affiliated person, other than the licensed dealer, with whom the consumer personally deals. Moreover, under the DAPS system, the broker is given a deposit by the client on the automobile purchased, and the uncontradicted testimony has been that nothing but the honesty of the broker prevents him from absconding with the deposit. The function of the state licensing system is to prevent such dishonesty. In contrast, all UBS personnel dealing with the public are licensed under the UBS accommodation. While there can be some question as to the legality of the UBS operation under this accommodation, the accommodation is by no means "similar" to the DAPS proposal rejected by the MVA.

■ Even if the UBS accommodation is not in accordance with the provisions of § 15–402, *et seq.,* and even if the DAPS proposal were similar to the UBS accommodation, these circumstances standing alone would not entitle plaintiffs to relief. Absent some indication that a provision is enforced in "[an invidious manner] or in bad faith, *i. e.,* based upon such impermissible considerations as race, religion, or the desire to prevent [the] exercise of constitutional rights[,]" inconsistent application of a provision does not rise to a constitutional violation. *Cf. United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974); *also United States v. Johnson,* 577 F.2d 1304 (5th Cir. 1978); *United States v. Wallace,* 578 F.2d 735 (8th Cir. 1978); *United States v. Cooper,* 577 F.2d 1079 (6th Cir. 1978); *United States v. Union Nacional de Trabajadores,* 576 F.2d 388 (1st Cir. 1978); *United States v. Arias,* 575 F.2d 253 (9th Cir. 1978); *United States v. Peskin,* 527 F.2d 71 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 58 L.Ed.2d 79 (1976). On the basis of the record which shows differences in the operation of DAPS and UBS and which reveals no bad faith on the part of the MVA, plaintiffs cannot prevail on their claim of selective enforcement.

### E. FIRST AMENDMENT CLAIM

■ Finally, plaintiffs argue that the challenged licensing requirement abridges their right under the First Amendment to disseminate new car purchasing advice, assistance, and expertise to clients. Plaintiffs cite in support *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691 (1977), and *Virginia State Board of Pharmacy v. Virginia Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). These cases stand for the right of licensed professionals, specifically lawyers and pharmacists, to advertise the cost of their services

to the public. The particular licensing provisions in question do not prevent DAPS from providing consumers with information on the price of new automobiles. The provisions do prevent unlicensed brokers from making arrangements on behalf of clients to purchase particular vehicles. Such conduct requires a license under Maryland law, and neither of the above cited cases requires a state to license an individual who fails to meet the qualifications which the state provides for obtaining a license. In view of the prior rulings on the constitutionality of the licensing requirement, plaintiffs' attack on the licensing requirement under the First Amendment is ineffective.

### IV. CONCLUSION

Despite their many-faceted attack on the Maryland scheme for licensing new vehicle salesmen, § 15–101(e), and §§ 15–402 *et seq.*, Transportation Article, Annotated Code of Maryland, plaintiffs fundamentally advance a single argument to invalidate the provisions, namely the substantive due process argument of the *Lochner* era, which has long since been abandoned by the courts. *See West Coast Hotel Co. v. Parrish, supra.* Plaintiffs have sought to bootstrap their substantive due process arguments by invoking the Commerce Clause to compel consideration of the policy behind the licensing scheme and its effectiveness through application of the balancing analysis mandated by *Pike v. Bruce Church, Inc., supra.* However, plaintiffs have failed to establish the requisite nexus between application of the challenged regulations to themselves and interstate commerce to sustain a claim under the Commerce Clause. The licensing provisions are rationally related to a legitimate state interest, and the provisions will be upheld.

Accordingly, it is this 27 day of December, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That Annotated Code of Maryland, Transportation Article, § 15–101(e) and §§ 15–402 *et seq.*, concerning the licensing of vehicle salesmen be, and the same is, hereby declared constitutional; and

2. That judgment be, and the same is, hereby entered in favor of each and every defendant and intervenor-defendant, and against the plaintiffs, Detroit Automotive Purchasing Services and John F. Patti, with costs.